**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF KANSAS**
**KANSAS CITY DIVISION**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| PINNACLE REGIONAL HOSPITAL, INC., *ET AL.*, | : | Case No. 20-20219 |
| | : | |
| | : | (Jointly Administered) |
| Debtors.[1] | : | |
| OFFICIAL COMMITTEE OF PINNACLE REGIONAL HOSPITAL, INC., *ET AL.*, | : | |
| | : | |
| Plaintiff, | : | Adv. Pro. No. 20- |
| | : | |
| v. | : | ADVERSARY COMPLAINT |
| | : | |
| GREAT WESTERN BANK, | : | |
| | : | |
| Defendant. | : | |

**COMPLAINT SEEKING (I) DECLARATORY RELIEF; (II) AVOIDANCE OF OBLIGATIONS AND LIENS; (III) RECOVERY OF MONEY; AND (IV) RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee" or "Plaintiff") of the above-captioned debtors (collectively, the "Debtors" or "Company"), as plaintiff herein, by and through undersigned counsel, files this Complaint (the "Complaint") and alleges as follows:

---

[1] The jointly administered Debtors in these cases are: Pinnacle Regional Hospital, Inc.; Pinnacle Regional Hospital, LLC; Blue Valley Surgical Associates, LLC; Pinnacle Health Care System, Inc.; Rojana Realty Investments, Inc.; and Joy's Majestic Paradise, Inc.

## JURISDICTION AND VENUE

1.      This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.  It arises in and relates to *In re Pinnacle Regional Hospital, Inc., et al.*, Chapter 11 Case No. 20-20219, pending in the United States Bankruptcy Court for the District of Kansas (the "Court").

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

3.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b).

4.      Plaintiff consents to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

5.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

6.      Plaintiff is the Official Committee of Unsecured Creditors of Pinnacle Regional Hospital, Inc., and its affiliated debtors, appointed in the above-captioned chapter 11 bankruptcy cases on March 31, 2020.

7.      Defendant, Great Western Bank (the "Bank" or "Defendant"), is a bank chartered under the laws of the State of South Dakota and is the prepetition and post-petition lender as set forth in the Interim Financing Order (as defined below).  The Bank may be served with process pursuant to Federal Rule of Bankruptcy Procedure 7004(h) via certified mail, addressed to Ken Karels, President and Chief Executive Officer, Great Western Bank, 225 South Main Avenue, Sioux Falls, South Dakota 57104.

2

## PRELIMINARY STATEMENT

8. In October 2018, the Bank financed the leveraged acquisition by Debtor Pinnacle Health Care System, Inc. of the equity interests in Debtor Pinnacle Regional Hospital, LLC. (then known as Cooper County Community Hospital, LLC). In connection with that acquisition, the Bank required that Pinnacle Regional Hospital, LLC execute and deliver an upstream guaranty of the acquisition loan and a cross-stream guaranty of unrelated indebtedness owed to the Bank by certain of the other Debtors. Pinnacle Regional Hospital, LLC also was required to grant the Bank liens in its assets to secure its obligations under these guaranties and, in the case of a deed of trust on its real property in Missouri, obligations for loans made by the Bank to parties other than Pinnacle Regional Hospital, LLC, even if not guaranteed by Pinnacle Regional Hospital, LLC.

9. In connection with the acquisition loan, two other Debtors were required to execute and deliver to the Bank cross-stream guaranties of the acquisition loan. In particular, Debtors Joy's Majestic Paradise, Inc. and Rojana Realty Investments, Inc. each executed and delivered to the Bank in October 2018 a guaranty of the acquisition loan. Each of these Debtors previously had obtained a loan from the Bank and granted a deed of trust to the Bank encumbering its real property in Missouri and a mortgage encumbering its real property in Kansas. On information and belief, the Bank contends that the respective deed of trust and mortgage of each of these Debtors secure the obligations under its cross-stream guaranty.

10. For the reasons set forth in this Complaint, the guaranties and security documents executed and delivered on behalf of Pinnacle Regional Hospital, LLC to the Bank were not signed by persons that were empowered to bind Pinnacle Regional Hospital, LLC to these documents, and they are not enforceable against that Debtor.

3

11.     Moreover, even if these documents had been duly executed on behalf of Pinnacle Regional Hospital, LLC, each is subject to avoidance as a fraudulent obligation or fraudulent transfer for the reasons set forth in this Complaint.

12.     Accordingly, the Debtors' estates in these administratively consolidated cases (collectively, the "Estate") are entitled to a judgment declaring that these documents are unenforceable for lack of effective execution and a judgment avoiding the obligations incurred and the transfers made under them, as applicable, as fraudulent obligations/transfers.

13.     Insofar as Joy's Majestic Paradise, Inc. and Rojana Realty Investments, Inc. are concerned, under Missouri and Kansas law, respectively, the liens of their respective deeds of trust and mortgages do not extend to indebtedness beyond the respective loans in connection with which those documents were executed and delivered. Accordingly, the Estate is entitled to a judgment so declaring.

14.     Alternatively, if such declaratory relief is not granted, for the reasons set forth in this Complaint, judgment should be entered in favor of the Estate against the Bank avoiding the cross-stream guaranties executed by Joy's Majestic Paradise, Inc. and Rojana Realty Investments, Inc. as fraudulent obligations.

15.     Finally, the Estate also should be found to be entitled to the monetary relief requested in this Complaint.

4

# BACKGROUND

## I.     General Background

16.     On February 12, 2020 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

17.     On March 31, 2020, pursuant to section 1102 of the Bankruptcy Code, the United States Trustee appointed a seven (7) member committee of unsecured creditors of the Debtors in connection with these chapter 11 cases.

18.     Also on March 31, 2020, this Court approved the appointment of Mr. James A. Overcash as chapter 11 trustee for Debtors Pinnacle Regional Hospital, Inc., Pinnacle Regional Hospital, LLC, Blue Valley Surgical Associates, LLC, and Pinnacle Health Care System, Inc. An order confirming that appointment was entered on April 1, 2020.

19.     On April 20, 2020, an order was entered by this Court appointing Mr. Overcash as chapter 11 trustee for Debtors Rojana Realty Investments, Inc. and Joy's Majestic Paradise, Inc.

## II.     The Interim Financing Order

20.     On April 23, 2020, this Court entered the *Stipulation and Interim Order (I) Authorizing Secured Post-Petition Financing on a Superpriority Basis Pursuant to 11 U.S.C. § 364, (II) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §§ 363 and 364, (III) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 363 and 364, and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(C)* (the "Interim Financing Order").

21.     Under the Interim Financing Order, $800,000 of Pinnacle Regional Hospital, LLC's cash (the "PRH LLC Cash") was treated as having been paid to the Bank and applied by the Bank to that Debtor's alleged prepetition indebtedness to the Bank, and as having been advanced post-petition to Pinnacle Health Care System, Inc. by the Bank. Under the Interim

5

Financing Order, this payment to the Bank was without prejudice to the rights of any party in interest to seek any available remedy against the Bank in the event the Bank was found not to have a valid, enforceable lien on the PRH LLC Cash.

22.     Pursuant to the provisions of the Interim Financing Order, the Committee has standing to file and prosecute this Complaint, as the representative of the Estate solely for that purpose.

## **FACTUAL BACKGROUND**

### I.     **The Blue Valley Group's Relationships with the Bank before the Acquisition of Boonville Hospital**

23.     Until the cessation of their respective operations, Debtors Pinnacle Regional Hospital, Inc.[2], Blue Valley Surgical Associates, LLC ("Blue Valley Surgical"), and Pinnacle Regional Hospital, LLC[3] were engaged in providing healthcare services to patients in Kansas and Missouri. As of the filing of their chapter 11 petitions, these Debtors were members of an affiliated group of companies (the "Blue Valley Group") that had been created and/or assembled by an entrepreneur, Douglas C. Palzer ("Palzer").

24.     Before its provider agreement was terminated, effective April 11, 2018, by the Centers for Medicare and Medicaid Services ("CMS"), Blue Valley Hospital was the primary generator in the Blue Valley Group of healthcare-related revenues. The termination of Blue Valley Hospital's provider agreement posed an existential threat to the Blue Valley Group. It precipitated

---

[2] Until it changed its name on December 20, 2018, Pinnacle Regional Hospital, Inc. was known as Blue Valley Hospital Inc. In an effort to avoid its being confused with Debtor Pinnacle Regional Hospital, LLC, and because most of the events described in this Complaint involving this Debtor occurred before its name change, Pinnacle Regional Hospital, Inc. is referred to hereafter in this Complaint as "Blue Valley Hospital."

[3] Until it changed its name on January 11, 2019, Pinnacle Regional Hospital, LLC was known as Cooper County Community Hospital, LLC. It operated a hospital in Boonville, Cooper County, Missouri. In an effort to avoid its being confused with Pinnacle Regional Hospital, Inc., Pinnacle Regional Hospital, LLC is referred to hereafter in this Complaint as "Boonville Hospital."

6

a search for a hospital (with a provider agreement) that could be acquired in an effort to fill the void created by CMS's termination of Blue Valley Hospital's provider agreement.

25.    In connection with the search for a replacement hospital, Debtor Pinnacle Health Care System, Inc. ("PHCSI") was formed as a Missouri corporation in July 2018 to be the entity in the Blue Valley Group that would acquire the replacement hospital. In order to acquire a replacement hospital, a source of financing for the acquisition had to be procured.

26.    Before the search for a replacement hospital began, a number of entities in the Blue Valley Group had established borrowing relationships with the Bank. In that regard, on or about August 25, 2017, Blue Valley Hospital, Blue Valley Surgical, and non-debtor, Blue Valley Health Care System, Inc. (collectively, the "August 2017 Borrowers"), entered into a Loan Agreement with the Bank (the "LOC Loan Agreement"), under which the Bank extended to them a revolving line of credit (the "LOC") up to the lesser of (i) $10,000,000, or (ii) 80% of their eligible accounts (as modified in October 2018, the "LOC Loan").

27.    The borrowers' obligations to repay the advances under the LOC were evidenced originally by a note in the stated principal sum of $10,000,000 (the "LOC Note"). The LOC Note was ambiguous about its maturity date. While, on the one hand, it identified the maturity date as August 25, 2018, on the other hand, it provided that advances under the LOC could be obtained by the August 2017 Borrowers prior to December 1, 2018 or the earlier termination of the LOC Note. The ability to draw on the LOC until December 1, 2018 was at odds with an August 25, 2018 maturity date.

28.    Under the LOC Loan Agreement, the Bank also made three term loans to the August 2017 Borrowers in the aggregate principal sum of $3,395,000 (the "August 2017 Term

7

Loans"). The LOC Loan and the August 2017 Term Loans were secured by substantially all of the personal property of the August 2017 Borrowers and were guaranteed by Palzer.

29.     On or about April 16, 2018, the Bank made an additional term loan of $669,000 to the August 2017 Borrowers, secured by the same collateral that secured the LOC Loan and the August 2017 Term Loans and guaranteed by Palzer.

30.     Certain members of the Blue Valley Group that were not engaged in the business of providing healthcare-related services also had borrowing relationships with the Bank before Blue Valley Hospital's provider agreement was terminated. In that regard, Debtor Joy's Majestic Paradise, Inc., a Missouri corporation ("Joy's Majestic"), which appears to have been organized to invest in real property, borrowed $3,866,200 from the Bank on or about February 7, 2018 (the "Joy's Majestic Loan"). Joy's Majestic's indebtedness on that loan is evidenced by a note dated February 7, 2018 in the stated principal sum of $3,866,200 made by Joy's Majestic to the Bank, as payee (the "Joy's Note"). As security for that loan, Joy's Majestic executed and delivered for the benefit of the Bank a deed of trust, effective February 7, 2018, encumbering certain real property it owned in Missouri (the "Joy's Deed of Trust") and a mortgage, dated as of February 7, 2018, encumbering certain real property it owned in Kansas (the "Joy's Mortgage"). The Joy's Deed of Trust explicitly limits the indebtedness secured thereby to the maximum principal amount of $3,866,200. The maximum amount stated in the Joy's Mortgage is $3,866,200.

31.     Joy's Majestic also executed and delivered to the Bank a guaranty of an apparently contemporaneous loan made by the Bank to another member of the Blue Valley Group, Rojana Realty Investments, Inc. (the "Joy's Rojana Loan Guaranty"). In this guaranty, Joy's Majestic absolutely waived all rights of subrogation, reimbursement, contribution, indemnification or exoneration it otherwise would have against other obligors if called upon to honor its guaranty.

US2008 17061808 11

These rights were not simply postponed until the Bank had been paid. On information and belief, the Bank contends that the Joy's Deed of Trust and the Joy's Mortgage also secure Joy's Majestic's obligations under the Joy's Rojana Loan Guaranty.

32. As alluded to above, on or about February 7, 2018, Debtor Rojana Realty Investments, Inc., a Kansas corporation ("Rojana"), obtained a loan from the Bank (the "Rojana Loan"). In connection with that transaction, Rojana executed a note dated February 7, 2018 in the stated principal sum of $4,701,800 payable to the Bank (the "Rojana Note"). As security for that loan, Rojana executed and delivered for the benefit of the Bank a deed of trust, effective as of February 7, 2018, encumbering certain real property it owned in Missouri (the "Rojana Deed of Trust") and a mortgage, dated as of February 7, 2018, encumbering certain real property it owned in Kansas (the "Rojana Mortgage"). The Rojana Deed of Trust provides that it secures payment of indebtedness in the sum of $4,300,000, according to the terms of a promissory note of even date therewith. The Rojana Deed of Trust limits the indebtedness secured thereby to the maximum principal amount of $4,300,000. The maximum amount stated in the Rojana Mortgage is $4,701,800.

33. Rojana also executed and delivered to the Bank a guaranty of the Joy's Majestic Loan (the "Rojana Joy's Loan Guaranty"). In this guaranty, Rojana absolutely waived all rights of subrogation, reimbursement, contribution, indemnification or exoneration it otherwise would have against other obligors, if called upon to honor its guaranty. These rights were not simply postponed until the Bank had been paid. On information and belief, the Bank contends that the Rojana Deed of Trust and the Rojana Mortgage also secure Rojana's obligations under the Rojana Joy's Loan Guaranty.

9

## II.    The Acquisition of Boonville Hospital

34.    On information and belief, during the summer of 2018, the Blue Valley Group identified Boonville Hospital as a potentially available acquisition candidate and began negotiations with its sole member, RHG Consolidated LLC ("RHGC"), to acquire RHGC's membership interests in Boonville Hospital. Having already developed a substantial lending relationship with members of the Blue Valley Group, the Bank evinced a willingness to finance the acquisition of Boonville Hospital.

35.    Based on its checkered history, Boonville Hospital was not a particularly attractive acquisition target, and, on information and belief, RHGC was pleased to have the opportunity to unload it.

36.    Until February 7, 2018, an apparently struggling hospital known as Cooper County Memorial Hospital ("CCMH") operated in Boonville, Missouri. On or about February 7, 2018, pursuant to an asset purchase agreement dated December 28, 2017 (the "APA"), Boonville Hospital, which had been formed by RHGC to make the acquisition, acquired the assets of CCMH and began to operate a hospital on the premises where CCMH had operated.

37.    It is reasonable to infer that, at the time this transaction closed, CCMH was experiencing difficulty paying its debts as they came due. Indeed, a portion of the purchase price was contingent on the Buyer's ability to negotiate discounts on past due payables, which were being assumed by the buyer.

38.    Despite the hospital's condition, apparently for political reasons, in order to close the deal, Boonville Hospital was required to agree in the APA (subject to certain conditions) to construct a combined hospital and clinic facility meeting certain specifications (the "New Facility") to replace the existing facility (the "New Facility Obligations"). RHGC was required to

10

guarantee Boonville Hospital's obligations under the APA, including the New Facility Obligations. RHGC believed, at that time, that Boonville Hospital would be able to meet its obligations through a combination of funds generated through New Market Tax Credits and a bank loan guaranteed under the USDA Rural Development Program. The perceived opportunity to exploit New Market Tax Credits vanished shortly after the acquisition, however, expunging the anticipated sources of complying with the New Facility Obligations.

39.     The unaudited monthly financial statements of Boonville Hospital for the year-to-date period ended June 30, 2018 showed that Boonville Hospital's year-to date EBITDA was a negative $355,000 and that it would have incurred a net loss of more than $500,000 but for savings attributable to settlements of accounts payable. It is reasonable to infer from this information that Boonville Hospital lacked the resources to pay its debts as they matured, a condition that persisted into 2019, as shown in minutes of C-Suite meetings on March 11 and April 8, 2019. Those minutes reflect that critical maintenance of the hospital's facilities had been deferred for lack of resources and only the most critical payables were being paid.

40.     The financial statements referred to in paragraph 31 of this Complaint indicated that Boonville Hospital had positive equity. It attributed, however, over $9 million of asset value to fixed assets, which presumably consisted principally of the real property on which the hospital operated. On information and belief, that property was subject to restrictive covenants that limited its use to the operation of a hospital. Under such circumstances, the fair value of its fixed assets would be discounted substantially. Furthermore, on information and belief, the liabilities on the balance sheet did not reflect the overhang of the New Facility Obligations.

41.     Notwithstanding Boonville Hospital's blemishes, RHGC was able to negotiate and enter into a Membership Interest Purchase Agreement with PHCSI, dated August 28, 2018 (the

US2008 17061808 11

"MIPA"), providing for the purchase by PHCSI from RHGC of all of the issued, outstanding and uncertificated membership interests in Boonville Hospital for $6,500,000. The MIPA provided, among other things, that RHGC would retain the cash and cash equivalents on deposit in Boonville Hospital's accounts listed on an exhibit to the MIPA.

42.     While the MIPA did include provisions allowing PHCSI to terminate it if reasonable accommodations could not be obtained from (i) CCMH, (ii) the responsible officials of Cooper County, Missouri, or (iii) other local officials regarding Boonville Hospital's obligations under the APA, in a Closing Agreement entered into with RHGC in early September 2018, PHCSI waived that termination right, as well as the financing contingency in the MIPA.

43.     Based on the documents thus far made available to the Committee, it is unclear exactly when PHCSI's acquisition of the membership interests in Boonville Hospital closed. Though an Assignment of Membership Interest executed by RHGC (the "Assignment"), which states it was made on September 28, 2018 (which is denominated the "Effective Date" therein), provides that RHGC thereby assigns to PHCSI all of the membership interests in Boonville Hospital and that PHCSI is thereby admitted as the sole member of Boonville Hospital, an undated disbursement instruction letter signed on behalf of PHCSI and RHGC raises a question about whether the Assignment was delivered to PHCSI before October 3, 2018.

44.     The Bank agreed to fund PHCSI's purchase of the membership interests in Boonville Hospital by making a $6,500,000 term loan to PHCSI (the "Acquisition Loan"). In connection with that loan, PHCSI executed and delivered to the Bank (i) a promissory note, dated October 3, 2018, in the stated principal sum of $6,500,000 (the "Acquisition Loan Note"), and (ii) a loan agreement, dated October 3, 2018, setting forth the terms of the Acquisition Loan (the "Acquisition Loan Agreement").

US2008 17061808 11

45. It does not appear that PHCSI was required to grant a security interest to the Bank in any of its assets to obtain the Acquisition Loan. Instead, the Acquisition Loan Agreement required the execution and delivery by Boonville Hospital, the target of the leveraged acquisition, of a guaranty of the Acquisition Loan, a security agreement granting a security interest in all of its business assets, and a deed of trust encumbering the real property in Cooper County, Missouri on which Boonville Hospital conducted its operations (the "Boonville Hospital Real Property").

46. The Acquisition Loan Agreement, among other things, also required that the Acquisition Loan be guaranteed by Joy's Majestic and Rojana, entities that, on information and belief, had no involvement in the Blue Valley Group's healthcare business.

47. In connection with the Acquisition Loan, a guaranty, dated October 3, 2018 (the "Boonville Hospital Acquisition Loan Guaranty") was executed (as described in more detail hereinafter) and delivered to the Bank on behalf of Boonville Hospital. This guaranty purported to guarantee the repayment of the Acquisition Loan.

48. Also executed (as described in more detail hereinafter) and delivered to the Bank on behalf of Boonville Hospital was (i) a Business Security Agreement, dated October 3, 2018 (the "Boonville Hospital Security Agreement"), granting the Bank a security interest in substantially all of Boonville Hospital's personal property to secure Boonville Hospital's obligations to the Bank, and (ii) a Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing Statement, effective October 3, 2018 (the "Boonville Hospital Deed of Trust"), encumbering the Boonville Hospital Real Property, purportedly as security for, not only Boonville Hospital's obligations to the Bank, but also the obligations of all of its affiliates to the Bank. The Boonville Hospital Deed of Trust provides that the maximum principal amount of the indebtedness secured

13

thereunder (exclusive of sums spent for the reasonable protection of the security thereof) is $6,500,000.

49.     The Boonville Hospital Deed of Trust also purports to be a security agreement encumbering the types of Boonville Hospital's personal property listed therein. Because the proper interpretation of "accounts," as listed therein, is limited to deposit accounts, it does not purport to encumber Boonville Hospital's receivables. In that regard, section 2.9(A) of the Boonville Hospital Deed of Trust includes within the description of the personal property collateral "accounts (including deposit accounts with Beneficiary of any kind)." The collateral description does not otherwise include deposit accounts. Given the parenthetical phrase that follows the word "accounts" in the description of the collateral and the fact that deposit accounts are not otherwise mentioned, the most reasonable interpretation of "accounts," as referenced in section 2.9(A), is that it encompasses deposit accounts, not receivables.

50.     Along with the guaranties of certain healthcare-related members of the Blue Valley Group, guaranties, dated October 3, 2018, of the indebtedness under the Acquisition Loan Note and the Acquisition Loan Agreement were executed and delivered on behalf of Joy's Majestic (the "Joy's Acquisition Loan Guaranty") and Rojana (the "Rojana Acquisition Loan Guaranty"). In its respective guaranty, Joy's Majestic and Rojana each waived all rights of subrogation, reimbursement, contribution, indemnification or exoneration it otherwise would have against the other obligors, if called upon to honor its guaranty. These rights were not simply postponed until the Bank had been paid. They were absolutely waived.

## III.     The Second Loan Modification Agreement

51.     Apparently contemporaneously with the documenting of the Acquisition Loan, the August 2017 Borrowers and the Bank entered into a Second Loan Modification Agreement, dated

14

October 3, 2018 (the "SLMA"), modifying the LOC Loan Agreement. Under the SLMA, the maturity date of the LOC was extended to September 30, 2019, and the cap on the LOC apparently was increased to $12 million. The other component of the Borrowing Base, however, was modified to provide, in relevant part: "The sum (sic) Eligible accounts less than 91 days aged excluding all Medicare and Medicaid A/R at 80%, less carve outs. Carve outs include $2,000,000 Corporate Card and the $6,500,000 Cooper County Community Hospital, LLC acquisition loan ('CCCH Loan') exclusions. Once acceptable appraisal review is received for CCCH Loan, term loan carve out will drop to the amount of the term loan in excess of 65% loan to value."

52.     In addition to Boonville Hospital and its assets being subjected to the Acquisition Loan debt (incurred to buy-out RHGC's equity interest in Boonville Hospital), the SLMA provided that, on or before October 30, 2018, the Bank shall have received a guaranty by Boonville Hospital of the LOC Loan. In that regard, a guaranty of the LOC Loan, dated October 3, 2018, was executed and delivered to the Bank on behalf of Boonville Hospital (the "Boonville Hospital LOC Loan Guaranty" and, together with the Boonville Hospital Acquisition Loan Guaranty, the "Boonville Hospital Guaranties").

## IV.    Ineffective Execution of Documents

53.     The execution of debt and security documents on behalf of Boonville Hospital in connection with the October 3, 2018 transactions, as referenced above, was haphazard and inconsistent. It did not meet the standard necessary to bind Boonville Hospital to the obligations purportedly undertaken, and to encumber its property as security, for indebtedness incurred to the Bank by other members of the Blue Valley Group, the proceeds of which did not flow to Boonville Hospital.

15

54.     The Boonville Hospital Guaranties, the Boonville Hospital Security Agreement, and the Boonville Hospital Deed of Trust were not executed consistently. Each of the Boonville Hospital Guaranties was executed on behalf of Boonville Hospital "By: T. Wells under Power of Attorney for Doug Palzer Its: CEO." The only power of attorney that has been produced belies any assertion that Wells was authorized to sign for Palzer on behalf of Boonville Hospital. That power of attorney is a Limited Power of Attorney, dated October 1, 2018 (the "POA").

55.     The POA purports to appoint Todd Wells as agent-in-fact for Palzer to "[s]ign all documents with Great Western Bank on the extension of the line of credit, including, but not limited to, revolving promissory note, loan agreement, guaranty, security agreement, or any other documents necessary to complete this transaction." This purported authority, however, is limited to the companies that are listed in the POA. Boonville Hospital is not included in that list. Given the absence of Boonville Hospital from that list, Wells simply was not authorized by the POA to sign for Palzer, in Palzer's purported capacity as an officer of Boonville Hospital.

56.     Furthermore, given that the power granted under the POA was limited to the signing of documents "on the extension of the line of credit," Wells had no power to sign the Boonville Hospital Acquisition Loan Guaranty, even if one indulges the dubious proposition that the "on the extension of the line of credit" language in the POA was sufficiently specific to empower Wells to sign, for Palzer, documents (i) purporting to obligate Boonville Hospital for loans made by the Bank to the August 2017 Borrowers, and (ii) purporting to encumber Boonville Hospital's real and personal property as security for such loans.

57.     Any argument that Wells himself was an officer of Boonville Hospital with authority, in his own right, to bind Boonville Hospital to the Boonville Hospital Guaranties cannot pass muster. The fact that a power of attorney empowering Wells to sign for Palzer was deemed

16

necessary to authorize Wells to bind members of the Blue Valley Group undermines any assertion that Wells was otherwise authorized to do so. Nor did Wells purport to sign the CCH Guaranties in his own capacity.

58.     The signatures on the Boonville Hospital Guaranties also underscore the confusion that reined about who, if anyone, was a duly appointed officer of Boonville Hospital, and, if so, what office she or he held. While Wells' execution of the guaranties purports to be for Palzer as CEO, minutes of post-acquisition Boonville Hospital Board and C-Suite meetings refer to Randy Simmons (who was employed by Boonville Hospital before the acquisition and remained as CEO after the acquisition) as CEO.

59.     Finally, an undated Unanimous Written Consent of the purported managers of Boonville Hospital (the "Purported Managers' UWC"), which purports to elect officers of Boonville Hospital, does not designate Palzer as CEO. Moreover, it purports only to authorize Boonville Hospital *to borrow* $6,500,000 from the Bank and to authorize the President and Secretary to execute and deliver documents in connection with such borrowing. Plaintiff is unaware of any governance documents authorizing officers of Boonville Hospital to cause Boonville Hospital to guarantee the debts of others or encumber its assets as security for the debts of others.

60.     Underscoring the lack of consistency in the execution of the transaction documents on behalf of Boonville Hospital, though Wells again purports to sign it under the POA for Palzer, the Boonville Hospital Security Agreement, unlike the Boonville Hospital Guaranties, is not signed on behalf of Palzer, as a purported officer of Boonville Hospital.  Rather, the signature block is constructed such that execution on behalf of Boonville Hospital is by PHCSI, its sole member, "By: T. Wells under Power of Attorney for Doug Palzer." Under the signature line appear

US2008 17061808 11

the words, "Douglas C. Palzer, President." Plaintiff is unaware, however, of any governance documents of PHCSI that (i) elect directors in accordance with PHCSI's articles of incorporation and by-laws, (ii) effectively appoint any officers of PHCSI, or (iii) even purport to authorize any officer(s) of PHCSI to cause its sole subsidiary, Boonville Hospital, to encumber its assets to secure loans made to others.

61.     In that regard, on information and belief, the articles of incorporation of PHCSI provide that the number of directors to constitute the board of directors is 2, but neither of such directors is named in the articles. On information and belief, the by-laws of PHCSI provide that the authorized number of directors of the corporation shall be equal to the number of initial directors named in the articles of incorporation, or if none are named, then the number of directors shall be one, until changed by amendment to the by-law. On information and belief, the purported directors of PHCSI at the time of the October 3, 2018 transactions had not been chosen in accordance with this by-law and could not effectively appoint officers of PHCSI or authorize them to cause its sole subsidiary, Boonville Hospital, to encumber its assets to secure loans made to others. Moreover, Plaintiff is unaware of any action by the purported directors that purported to elect officers of the corporation or authorize them to cause Boonville Hospital to encumber its assets to secure loans made to others.

62.     Such non-compliance with the governance documents of PHCSI is equally applicable to the execution and delivery of the Boonville Hospital Deed of Trust, which appears to have been executed on behalf of Boonville Hospital by PHCSI, its sole member, by Palzer, its purported president.

18

## V.    Suretyship Implications

63.    Because the Bank made no loans to Boonville Hospital, the Boonville Hospital Deed of Trust secured only loans made by the Bank to other members of the Blue Valley Group, up to a maximum principal amount of $6,500,000.  Boonville Hospital, accordingly, constituted a surety to the extent its property secured loans made to other members of the Blue Valley Group. Boonville Hospital did not waive, in the Boonville Hospital Deed of Trust, the right to invoke defenses available to a surety under suretyship law, such as the defense that its obligations to the beneficiary have been released and discharged by modifications of the underlying obligations, including the extension of the maturity of an underlying obligation, without the consent of the surety.

64.    On information and belief, the Bank made modifications to underlying obligations without the effective consent of Boonville Hospital that had the effect of releasing and discharging the lien of the Boonville Hospital Deed of Trust. For instance, pursuant to a Third Loan Modification Agreement dated as of September 30, 2019 (the "TLMA"), amendments were made to the LOC Note and the LOC Loan Agreement that would result under suretyship law in the release and discharge of the Boonville Hospital Deed of Trust.

65.    A Consent and Agreement regarding the TLMA, purportedly executed on behalf of Boonville Hospital by Palzer, as president of Boonville Hospital (the "C & A"), did not prevent the lien of the Boonville Hospital Deed of Trust from being released and discharged by the TLMA. For the reasons described earlier in this Complaint, Boonville Hospital governance documents do not support the conclusion that Palzer was effectively elected or appointed president of Boonville Hospital or authorized to sign the C & A on behalf of Boonville Hospital.  In addition, insofar as liens are concerned, the C & A purports only to prevent the TLMA from adversely affecting "any

19

Liens … of any of the undersigned under any of the Loan Documents." The Bank is not an "undersigned" with respect to the C & A, and "Lien" is not a defined term under the LOC Loan Agreement.

## VI.     Deposit Accounts

66.     On information and belief, as of the Petition Date, Debtors, including, without limitation, Pinnacle Regional Hospital, LLC, Pinnacle Health Care System, Inc., Pinnacle Regional Hospital, Inc., and Blue Valley Surgical Associates, LLC, had deposit accounts with banks other than the Bank. The Bank did not have deposit account control agreements for these deposit accounts.

### COUNT I
### Seeking the Entry of a Judgment Against the Bank Declaring That the Boonville Hospital Guaranties Are Invalid and Unenforceable

67.      The averments in paragraphs 1 through 7; 16 through 29; 34 through 45; 47 through 49; and 51 through 61 of this Complaint are incorporated by reference in Count I of this Complaint as fully and completely as if restated in Count I in their entirety.

68.     Neither the Boonville Hospital Acquisition Loan Guaranty nor the Boonville Hospital LOC Loan Guaranty was executed on behalf of Boonville Hospital by a person with the authority to bind Boonville Hospital to the obligations set forth in those documents.

69.     Based on a review of the documents provided to the Committee, no officers of Boonville Hospital or PHCSI were duly elected or appointed in compliance with applicable governance law, nor were any purported officers of these Debtors effectively empowered by their principals to cause Boonville Hospital to become liable for the debts of others to the Bank.

70.     Furthermore, even if Palzer had been duly appointed an officer of Boonville Hospital and duly authorized to commit Boonville Hospital to the Boonville Hospital Guaranties,

Wells' execution of the Boonville Hospital Guaranties, purportedly as attorney-in-fact for Palzer, was ineffectual. In the first place, powers of attorney are strictly construed. A power of attorney purporting to empower an attorney-in-fact to execute in the stead of the principal, "documents with [the Bank] on the extension of the line of credit," which does not even identify the borrowers under the "line of credit" or the date the line of credit was established, much less reference any documents evidencing the line of credit, is insufficiently definite to confer on the purported agent-in-fact the power to take any action in the principal's name.

71.     Second, even if the POA was not completely ineffectual, it did not empower Wells to sign documents, in Palzer's stead, on behalf of Boonville Hospital.  In particular, as described above, Boonville Hospital was not included in the list of companies in the POA for which Wells purportedly was empowered under the POA to sign for Palzer.

72.     Third, even if the POA was not completely ineffectual regarding the Boonville Hospital Guaranties, it would not authorize Wells to execute the Boonville Hospital Acquisition Loan Guaranty in Palzer's name, because the Boonville Hospital Acquisition Loan Guaranty is not a document on the extension of the line of credit. Execution of that guaranty was not a condition to the extension of the maturity date of the LOC. The Boonville Hospital Acquisition Loan Guaranty, instead, was executed and delivered in connection with the Acquisition Loan.

73.     For the reasons stated above, the Estate is entitled to a judgment on Count I of this Complaint against the Bank declaring that the Boonville Hospital Guaranties were not duly executed and are invalid and unenforceable.  In the event that such a judgment is not entered, the Estate nevertheless should be found to be entitled to a judgment  on Count I of this Complaint declaring that the Boonville Hospital Acquisition Loan Guaranty was not duly executed and is invalid and unenforceable.

US2008 17061808 11

74.     WHEREFORE, Plaintiff respectfully requests that (1) judgment be entered in favor of the Estate against the Bank on Count I of this Complaint, (i) declaring that the Boonville Hospital Guaranties are invalid and unenforceable, or, alternatively, (ii) declaring that the Boonville Hospital Acquisition Loan Guaranty is invalid and unenforceable; and (2) the Court grant Plaintiff such other and further relief as is proper, including ordering disgorgement by the Bank of payments received to the extent provided for under applicable law.

### COUNT II
### Seeking the Entry of (i) a Judgment Against the Bank Declaring That the Boonville Hospital Security Agreement Is Invalid and Unenforceable, and (ii) a Judgment Against the Bank for $800,000

75.     The averments in paragraphs 1 through 7; 16 through 29; 34 through 45; 47 through 49; and 51 through 61 of this Complaint are incorporated by reference in Count II of this Complaint as fully and completely as if restated in Count II in their entirety.

76.     By its terms, the Boonville Hospital Security Agreement secures only Boonville Hospital's obligations to the Bank. Those obligations were purportedly undertaken under the Boonville Hospital Guaranties. Because the Boonville Hospital Guaranties are invalid and unenforceable for the reasons previously stated, the liens granted in the Boonville Hospital Security Agreement do not secure an allowed secured claim.   Under section 506(d) of the Bankruptcy Code, with certain exceptions not implicated in this case, a lien is void if it does not secure an allowed secured claim. The Boonville Hospital Security Agreement, accordingly, will not survive a judgment declaring the Boonville Hospital Guaranties invalid and unenforceable (or a judgment avoiding Boonville Hospital's obligations under those guaranties as fraudulent obligations, as sought in Counts IV and V of this Complaint).

77.     Additionally, as averred in paragraph 63 of this Complaint, the POA, given its lack of specificity, was not effective to empower Wells to sign any documents for Palzer. Because the

US2008 17061808 11

Boonville Hospital Security Agreement was signed by Wells for Palzer (as the alleged president of Boonville Hospital's sole member, PHCSI) under the ineffective POA, the Boonville Hospital was not effectively executed.

78.     Furthermore, even if the POA was not completely ineffectual, it did not empower Wells to sign the Boonville Hospital Security Agreement for Palzer, because that security agreement was not a document on the extension of the line of credit.  The Boonville Hospital Security Agreement was required in connection with the Acquisition Loan, not the extension of the maturity date of the LOC Loan.

79.     Finally, Plaintiff has seen no evidence that Palzer was effectively appointed President  of PHCSI in accordance with its governance documents or duly authorized to cause Boonville Hospital to enter into the Boonville Hospital Security Agreement.

80.     For the reasons stated above, the Estate is entitled to a judgment against the Bank on Count II of this Complaint declaring that the Boonville Hospital Security Agreement is invalid and unenforceable.

81.     In addition, if the Boonville Hospital Security Agreement is found to be invalid and unenforceable, the Estate is entitled to a judgment against the Bank in the amount of $800,000, the amount of PRH LLC Cash that was provisionally applied to Boonville Hospital's purported prepetition indebtedness to the Bank under the Interim Financing Order, on the assumption that the Bank had a valid, enforceable prepetition security interest in such cash.

82.     WHEREFORE, Plaintiff respectfully requests that (1) judgment be entered in favor of the Estate against the Bank on Count II of this Complaint, declaring that the Boonville Hospital Security Agreement is invalid and unenforceable and does not encumber any of Boonville Hospital's property, (2) judgment be entered in favor of the Estate against the Bank on Count II of

23

this Complaint in the sum of $800,000, and (3) the Court grant Plaintiff such other and further relief as is proper, including ordering disgorgement by the Bank of payments received to the extent provided for under applicable law.

**COUNT III**
**Seeking the Entry of a Judgment Against the Bank Declaring (1) That the Boonville Hospital Deed of Trust Is Invalid and Unenforceable, or (2) Alternatively, That the Boonville Hospital Deed of Trust Was Released and Discharged by Actions of the Bank, or (3) Alternatively, That the Boonville Hospital Deed of Trust Does Not Encumber Boonville Hospital's Accounts Receivable**

83.     The averments in paragraphs 1 through 7; 16 through 29; 34 through 45; 47 through 49; and 51 through 65 of this Complaint are incorporated by reference in Count III of this Complaint as fully and completely as if restated in Count III in their entirety.

84.     Based on a review of the documents provided to the Committee, as of October 3, 2018 and any period thereafter relevant to this Complaint, Palzer had not been effectively appointed to the office of president, or any other officer position, of PHCSI in compliance with PHCSI's governance documents, nor had proper corporate action been taken to authorize him to cause PHCSI's sole subsidiary, Boonville Hospital, to execute and deliver the Boonville Hospital Deed of Trust or the C & A.

85.     Moreover, even if the Boonville Hospital Deed of Trust were found to have been executed effectively (which Plaintiff vigorously disputes), it was released and discharged under elementary principles of suretyship law by the actions of the Bank previously described in this Complaint.

86.     Furthermore, even were the Boonville Hospital Deed of Trust found to have been executed effectively and not released or discharged, it would be subject to strict construction under applicable state law and construed as not encumbering Boonville Hospital's accounts receivable.

24

87.     WHEREFORE, Plaintiff respectfully requests that (1) judgment be entered in favor of the Estate against the Bank under Count III of this Complaint declaring (i) that the Boonville Hospital Deed of Trust is invalid and unenforceable, (ii) that, to the extent, if any, it was effectively executed, the Boonville Hospital Deed of Trust was released and discharged by the actions of the Bank described in this Complaint, or (iii) alternatively, that the Boonville Hospital Deed of Trust does not encumber Boonville Hospital's accounts receivable; and (2) the Court grant Plaintiff such other and further relief as is proper, including disgorgement by the Bank of payments received to the extent provided for under applicable law.

### COUNT IV
### Seeking (1) the Avoidance, Under Section 548 of the Bankruptcy Code, of (i) Boonville Hospital's Obligations Under the Boonville Hospital Guaranties, and (ii) the Liens Granted Under the Boonville Hospital Security Agreement and the Boonville Hospital Deed of Trust, and (2) the Entry of a Judgment in Favor of the Estate Against the Bank in the Amount of $800,000 Under Section 550 of the Bankruptcy Code

88.     The averments in paragraphs 1 through 7; 16 through 29; 34 through 45; 47 through 49; and 51 through 52 of this Complaint are incorporated by reference in Count IV of this Complaint as fully and completely as if restated in Count IV in their entirety.

89.     Under section 548 of the Bankruptcy Code, obligations incurred or transfers made by a debtor within two years before the petition date may be avoided for the benefit of the debtor's estate, if the debtor received less than a reasonably equivalent value for such obligations or transfers, and the debtor (i) was insolvent on the date the obligations were incurred or the transfers were made, or became insolvent as a result of such obligations or transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured. 11 U.S.C. § 548(a)(1)(B).

US2008 17061808 11

90.     The obligations incurred by Boonville Hospital under the Boonville Hospital Acquisition Loan Guaranty and the Boonville Hospital LOC Loan Guaranty were incurred within two years before the Petition Date. Similarly, the grants by Boonville Hospital to the Bank of liens on its assets under the Boonville Hospital Security Agreement and under the Boonville Hospital Deed of Trust constituted transfers of an interest of Boonville Hospital in property made within two years before the Petition Date.

91.     In entering into the Boonville Hospital Guaranties, Boonville Hospital exposed itself to liability for at least $18,500,000 of principal indebtedness (the $6,500,000 Acquisition Loan and the $12,000,000 LOC) plus interest, charges and fees associated with that indebtedness. Any argument that this exposure should be heavily discounted in determining whether Boonville Hospital received reasonably equivalent value in exchange for incurring it because Boonville Hospital was only one of a number of obligors on this indebtedness cannot pass muster in this case. With respect to the Acquisition Loan, the borrower, PHCSI, had no assets other than its equity interest in Boonville Hospital. The acquisition was leveraged on the assets of Boonville Hospital, and Boonville Hospital and its assets were the anticipated sources of repayment.

92.     With respect to the LOC Loan, the principal borrower, Blue Valley Hospital, was effectively out of business by the time Boonville Hospital signed on to that debt. One of the other two borrowers, Blue Valley Health Care System, Inc., was not an entity of substance, and the other borrower, Blue Valley Surgical, had generated only a small fraction of the revenue of the borrowers of the LOC Loan proceeds and had experienced a net operating loss in the prior year of more than $2.5 million, as reflected in the consolidating statements of income for Blue Valley Hospital and its subsidiaries for the year ended December 31, 2017. In short, Boonville Hospital

26

was expected to replace Blue Valley Hospital as the source of the revenue to support the LOC Loan.

93. Moreover, Boonville Hospital was compelled not only to execute the Boonville Hospital Guaranties, as it came aboard, but also to waive all rights of subrogation, reimbursement, contribution, indemnification or exoneration it otherwise would have against the other obligors if called on to honor its guaranties. These rights were not simply postponed under the guaranties until the Bank had been paid. They were absolutely waived. Boonville Hospital received no direct quantifiable benefit that was reasonably equivalent to the magnitude of the exposure it undertook under the Boonville Hospital Guaranties. Nor can the Bank show that Boonville Hospital received quantifiable indirect benefits in exchange that were reasonably equivalent to the obligations incurred under the Boonville Hospital Guaranties.

94. These facts also demonstrate that Boonville Hospital did not receive reasonably equivalent value in exchange for the liens granted under the Boonville Hospital  Security Agreement and the Boonville Hospital Deed of Trust.

95. The magnitude of the exposure undertaken by Boonville Hospital in connection with the Boonville Hospital Guaranties, the Boonville Hospital Security Agreement and the Boonville Hospital Deed of Trust also mandates the conclusion that if Boonville Hospital, given its poor operating performance and the overhang of the New Facility Obligations, was not already insolvent at the time the obligations thereunder were incurred and the transfers thereunder were made, it became insolvent as a result of such obligations and transfers.

96. In addition, the continued deferral of critical maintenance and build-up of payables after the acquisition demonstrate that Boonville Hospital, which was denuded of much of its cash and cash equivalents at the time of its acquisition by PHCSI, was undercapitalized in October 2018

US2008 17061808 11

and thereafter and must have believed that it would continue to incur debts beyond its ability to pay as such debts came due.

97.    In light of these circumstances, under section 548 of the Bankruptcy Code, the obligations incurred under the Boonville Hospital Guaranties are avoidable as fraudulent obligations and the liens granted under the Boonville Hospital Security Agreement and the Boonville Hospital Deed of Trust are avoidable as fraudulent transfers.

98.    WHEREFORE, Plaintiff respectfully requests that (1) judgment be entered in favor of the Estate against the Bank on Count IV of this Complaint (i) avoiding, under section 548 of the Bankruptcy Code, the obligations incurred by Boonville Hospital under the Boonville Hospital Guaranties and the liens granted under the Boonville Hospital Security Agreement and the Boonville Hospital Deed of Trust, and (ii) preserving such liens for the benefit of the Estate under section 551 of the Bankruptcy Code; (2) judgment be entered in favor of the Estate against the Bank, under section 550 of the Bankruptcy Code, on Count IV of this Complaint in the sum of $800,000, provided, however, that if judgment is also entered against the Bank for $800,000 in respect of the PRH LLC Cash on any other Count of this Complaint, the Estate shall be entitled to only a single satisfaction; and (3) the Court grant Plaintiff such other and further relief as is proper, including ordering disgorgement by the Bank of payments received to the extent provided for under applicable law.

28

## COUNT V

**Seeking (1) the Avoidance, Under Sections 4(a)(2), 5(a) and 7of the Uniform Fraudulent Transfer Act and Section 544(b) of the Bankruptcy Code, of (i) Boonville Hospital's Obligations Under the Boonville Hospital Guaranties, and (ii) the Liens Granted Under the Boonville Hospital Security Agreement and the Boonville Hospital Deed of Trust, and (2) the Entry of a Judgment in Favor of the Estate Against the Bank in the Amount of $800,000 Under Section 550 of the Bankruptcy Code**

99.     The averments in paragraphs 1 through 7; 16 through 29; 34 through 45; 47 through 49; 51 through 52; and 90 through 96 of this Complaint are incorporated by reference in Count V of this Complaint as fully and completely as if restated in Count V in their entirety.

100.     Under section 544(b)(1) of the Bankruptcy Code, a representative of a debtor's estate may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an allowable unsecured claim or an unsecured claim that is not allowable only under section 502(e) of the Bankruptcy Code. 11 U.S.C. § 544(b)(1).

101.     At all times relevant to the claims in this Complaint, sections 4(a)(2), 5(a), 7, and 9 of the Uniform Fraudulent Transfer Act ("UFTA") were in effect in Kansas, Missouri and Delaware. Under section 9(b) of UFTA, the limitations period for fraudulent obligation/transfer claims brought under sections 4(a)(2) and/or 5(a) is four years after the obligation was incurred or the transfer was made. Under sections 4(a)(2) and 7 of UFTA, a creditor may avoid an obligation incurred or transfer made by a debtor (whether or not the creditor's claim arose before or after the obligation was incurred or the transfer was made), if the debtor incurred the obligation or made the transfer without receiving a reasonably equivalent value in exchange therefor and (i) the debtor was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (ii) the debtor

29

intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due. UFTA §§ 4(a)(2), 7.

102.    Under sections 5(a) and 7 of UFTA, a creditor whose claim arose before an obligation was incurred or a transfer was made by a debtor may avoid such obligation or transfer, if the debtor incurred such obligation or made such transfer without receiving a reasonably equivalent value in exchange therefor and the debtor was insolvent at that time or became insolvent as a result of the transfer or obligation. UFTA §§ 5(a), 7.

103.    Among other creditors of Boonville Hospital, W.W. Grainger, Inc., which held an allowable unsecured claim against Boonville Hospital on the Petition Date, also held an unsecured claim against Boonville Hospital at the time or times the obligations or transfers of which avoidance is sought in this Complaint were incurred or made, as applicable.

104.    Because, as set forth above, the elements of a fraudulent obligation claim and a fraudulent transfer claim under UFTA are satisfied with respect thereto, under section 544(b) of the Bankruptcy Code, Boonville Hospital's obligations under the Boonville Hospital Guaranties are avoidable as fraudulent obligations and the liens granted under the Boonville Hospital Security Agreement and the Boonville Hospital Deed of Trust are avoidable as fraudulent transfers for the benefit of the Estate.

105.    WHEREFORE, Plaintiff respectfully requests that (1) judgment be entered in favor of the Estate against the Bank under Count V of this Complaint (i) avoiding, under section 544(b) of the Bankruptcy Code, the obligations incurred by Boonville Hospital under the Boonville Hospital Guaranties and the liens granted under the Boonville Hospital Security Agreement and the Boonville Hospital Deed of Trust, and (ii) preserving such liens for the benefit of the Estate under section 551 of the Bankruptcy Code; (2) judgment be entered in favor of the Estate  against

30

the Bank, under Section 550 of the Bankruptcy Code, on Count V of this Complaint in the sum of $800,000, provided, however, that if judgment is also entered against the Bank for $800,000 in respect of the PRH LLC Cash on any other Count of this Complaint, the Estate shall be entitled to only a single satisfaction; and (3) the Court grant Plaintiff such other and further relief as is proper, including ordering disgorgement by the Bank of payments received to the extent provided for under applicable law.

## COUNT VI

### Seeking (1) the Avoidance, Under Section 544(a) of the Bankruptcy Code, of the Bank's Unperfected Liens in Deposit Accounts Maintained by the Debtors at Other Banks, and (2) a Judgment Against the Bank for $800,000 Under Section 550 of the Bankruptcy Code

106.    The averments in paragraphs 1 through 7; 16 through 29; 34; 44through 45; 47 through 49; 51 through 52; and 66 of this Complaint are incorporated by reference in Count VI of this Complaint as fully and completely as if restated in Count VI in their entirety.

107.    Because the Bank does not have deposit account control agreements regarding deposit accounts maintained by the Debtors with other Banks, the Bank's purported liens in such deposit accounts were unperfected on the Petition Date under section 9-312(b)(1) of the Uniform Commercial Code, as in effect in the applicable states.

108.    Accordingly, those liens may be avoided under section 544(a) of the Bankruptcy Code and preserved for the benefit of the Estate under section 551 of the Bankruptcy Code.

109.    WHEREFORE, Plaintiff respectfully requests that (1) judgment be entered in favor of the Estate against the Bank on Count VI of this Complaint (i) avoiding, under section 544(a) of the Bankruptcy Code, the Bank's liens in deposit accounts maintained by the Debtors at other banks, and (ii) preserving such liens for the benefit of the Estate under section 551 of the Bankruptcy Code; (2) judgment be entered in favor of the Estate against the Bank on Count VI of

this Complaint in the sum of $800,000, provided, however, that if judgment is also entered against the Bank for $800,000 in respect of the PRH LLC Cash on any other Count in this Complaint, the Estate shall be entitled to only a single satisfaction; and (3) the Court grant Plaintiff such other and further relief as is proper, including ordering disgorgement by the Bank of payments received to the extent provided for under applicable law.

## COUNT VII

**Seeking the Entry of a Judgment Against the Bank Declaring (i) That the Indebtedness Secured by the Joy's Deed of Trust and the Joy's Mortgage is Limited to the Principal Indebtedness on the Joy's Majestic Loan Plus Interest Thereon and Reasonable Attorneys' Fees, (ii) That the Bank is entitled to Only a Single Satisfaction, and (iii) That the Cross-Collateralization Provision in Each of the Joy's Deed of Trust and the Joy's Mortgage is Unenforceable**

110.    The averments in paragraphs 1 through 7; 16 through 26; 30 through 31; 34 through 40; 44; 46; and 50 of this Complaint are incorporated by reference in Count VII of this Complaint as fully and completely as if restated in Count VII in their entirety.

111.    Under RSMo § 443.055(2), the total principal amount of the obligations secured by the Joy's Deed of Trust may not exceed, at any given time, the face amount stated in the Joy's Deed of Trust.

112.    The face amount stated in the Joy's Deed of Trust is $3,866,200.

113.    Under K.S.A. § 58-2336, the lien of the Joy's Mortgage may not exceed, at any one time, the maximum amount stated in the Joy's Mortgage.

114.    The maximum amount stated in the Joy's Mortgage is $3,866,200.

115.    The "Cross Collateralization" provision in section 1.2(F) of the Joy's Mortgage refers to "Trustor" and "Beneficiary," terms that make no sense in the context of a mortgage and that are not defined in the Joy's Mortgage. Even were the effort in section 1.2(F) of the Joy's Mortgage to expand the indebtedness secured by the Joy's Mortgage beyond the indebtedness on

32

the Joy's Majestic Loan not negated by K.S.A. § 58-2336, it would be futile, given the meaningless terms used in section 1.2(F).

116.     WHEREFORE, Plaintiff respectfully requests that (1) judgment be entered in favor of the Estate against the Bank under Count VII of this Complaint declaring (i) that the indebtedness secured by the Joy's Deed of Trust and the Joy's Mortgage is limited to the principal indebtedness on the Joy's Majestic Loan plus interest thereon and reasonable attorneys' fees, (ii) that the Bank is entitled to only a single satisfaction, and (iii) that the cross-collateralization provision in the Joy's Deed of Trust and the Joy's Mortgage is unenforceable; and (2) the Court grant Plaintiff such other and further relief as is proper, including ordering disgorgement by the Bank of payments received to the extent provided for under applicable law.

## COUNT VIII

**Seeking the Entry of a Judgment Against the Bank Declaring (i) That the Indebtedness Secured by the Rojana Deed of Trust is Limited to $4,300,000 Plus Interest Thereon and Reasonable Attorneys' Fees, (ii) That the Indebtedness Secured by the Rojana Mortgage is Limited to $4,701,800 Plus Interest Thereon and Reasonable Attorneys' Fees, (iii) That the Bank is Entitled to Only a Single Satisfaction, and (iv) That the Cross-Collateralization Provision in the Rojana Deed of Trust and the Rojana Mortgage is Unenforceable**

117.     The averments in paragraphs 1 through 7; 16 through 26; 30 through 40; 44; 46; and 50 of this Complaint are incorporated by reference in Count VIII of this Complaint as fully and completely as if restated in Count VIII in their entirety.

118.     Under RSMo § 443.055(2), the total principal amount of the obligations secured by the Rojana Deed of Trust may not exceed, at any given time, the face amount stated in the Rojana Deed of Trust.

119.     The face amount stated in the Rojana Deed of Trust is $4,300,000.

120.     Under K.S.A. § 58-2336, the lien of the Rojana Mortgage may not exceed, at any one time, the maximum amount stated in the Rojana Mortgage.

33

121.    The maximum amount stated in the Rojana Mortgage is $4,701,800.

122.    The "Cross Collateralization " provision in section 1.2(F) of the Rojana Mortgage refers to "Trustor" and "Beneficiary," terms that make no sense in the context of a mortgage and that are not defined in the Rojana Mortgage. Even were the effort in section 1.2(F) of the Rojana Mortgage to expand the indebtedness secured by the Rojana Mortgage beyond the indebtedness on the Rojana Loan not negated by K.S.A. § 58-2336, it would be futile, given the meaningless terminology in section 1.2(F).

123.    WHEREFORE, Plaintiff respectfully requests that (1) judgment be entered in favor of the Estate against the Bank under Count VIII of this Complaint declaring (i) that the indebtedness secured by the Rojana Deed of Trust is limited to $4,300,000 plus interest thereon and reasonable attorneys' fees, (ii) that the indebtedness secured by the Rojana Mortgage is limited to $4,701,800 plus interest thereon and reasonable attorneys' fees, (iii) that the Bank is entitled only to a single satisfaction, and (iv) that the cross-collateralization provision in the Rojana Deed of Trust and the Rojana Mortgage is unenforceable; and (2) the Court grant Plaintiff such other and further relief as is proper, including ordering disgorgement by the Bank of payments received to the extent provided for under applicable law.

34

## COUNT IX

**Seeking, Alternatively, in the Event the Relief Requested in Count VII of This Complaint is not Granted, the Avoidance, Under Section 548 of the Bankruptcy Code, Sections 4(a)(2), 5(a) and 7 of the Uniform Fraudulent Transfer Act, and Section 544(b) of the Bankruptcy Code, of (i) Joy's Majestic's Obligations Under the Joy's Acquisition Loan Guaranty, and (ii) the Liens of the Joy's Deed of Trust and the Joy's Mortgage to the Extent, if Any, They Purport to Secure Joy's Majestic's Obligations Under the Joy's Acquisition Loan Guaranty**

124.    The averments in paragraphs 1 through 7; 16 through 41; 44 through 46; 50; 89; and 100 through 102 of this Complaint are incorporated by reference in Count IX of this Complaint as fully and completely as if restated in Count IX in their entirety.

125.    The obligations incurred by Joy's Majestic under the Joy's Acquisition Loan Guaranty were incurred within two years before the Petition Date.

126.    Joy's Majestic did not receive a reasonably equivalent value in exchange for incurring the obligations under the Joy's Acquisition Loan Guaranty.

127.    If the relief requested in Count VII of this Complaint is not granted, Joy's Majestic will have been rendered insolvent and undercapitalized as a result of incurring the obligations under the Joy's Acquisition Loan Guaranty. Under those circumstances, the Estate is entitled to avoid the obligations under the Joy's Acquisition Loan Guaranty as fraudulent obligations and, to the extent, if any, they purport to secure those obligations, the liens of the Joy's Deed of Trust and the Joy's Mortgage as fraudulent transfers.

128.    WHEREFORE, Plaintiff respectfully requests that, if the relief requested in Count VII of this Complaint is not granted, (1) judgment be entered in favor of the Estate against the Bank under Count IX of this Complaint avoiding, under sections 548 and 544(b) of the Bankruptcy Code, the obligations incurred under the Joy's Acquisition Loan Guaranty and the liens of the Joy's Deed of Trust and the Joy's Mortgage to the extent, if any, they purport to secure those

35

obligations; and (2) the Court grant Plaintiff such other and further relief as is proper, including ordering disgorgement by the Bank of payments received to the extent provided for under applicable law.

## COUNT X

**Seeking, Alternatively, in the Event the Relief Requested in Count VIII of this Complaint is not Granted, the Avoidance, Under Section 548 of the Bankruptcy Code, Sections 4(a)(2), 5(a) and 7 of the Uniform Fraudulent Transfer Act, and Section 544(b) of the Bankruptcy Code, of (i) Rojana's Obligations Under the Rojana Acquisition Loan Guaranty, and (ii) the Liens of the Rojana Deed of Trust and the Rojana Mortgage to the Extent, if Any, They purport to Secure Rojana's Obligations Under the Rojana Acquisition Loan Guaranty**

129.    The averments in paragraphs 1 through 7; 16 through 41; 44 through 46; 50; 89; and 100 through 102 of this Complaint are incorporated by reference in Count X of this Complaint as fully and completely as if restated in Count X in their entirety.

130.    The obligations incurred by Rojana under the Rojana Acquisition Loan Guaranty were incurred within two years before the Petition Date.

131.    Rojana did not receive a reasonably equivalent value in exchange for incurring the obligations under the Rojana Acquisition Loan Guaranty.

132.    If the relief requested in Count VIII of this Complaint is not granted, Rojana will have been rendered insolvent and undercapitalized as a result of incurring the obligations under the Rojana Acquisition Loan Guaranty. Under those circumstances, the Estate is entitled to avoid the obligations under the Rojana Acquisition Loan Guaranty as fraudulent obligations and, to the extent, if any, they purport to secure those obligations, the liens of the Rojana Deed of Trust and the Rojana Mortgage as fraudulent transfers.

133.    WHEREFORE, Plaintiff respectfully requests that if the relief requested in Count VIII of this Complaint is not granted, (1) judgment be entered in favor of the Estate against the Bank under Count X of this Complaint avoiding under sections 548 and 544(b) of the Bankruptcy

36

Code, the obligations incurred under the Rojana Acquisition Loan Guaranty and the liens of the Rojana Deed of Trust and the Rojana Mortgage to the extent, if any, they purport to secure those obligations; and (2) the Court grant Plaintiff such other and further relief as is proper, including ordering disgorgement by the Bank of payments received to the extent provided for under applicable law.

## COUNT XI

**Seeking the Entry of a Judgment Against the Bank, Under Section 502(d) of the Bankruptcy Code, Declaring (1) That, to the Extent the Relief Requested in Count IV, Count V or Count VI of This Complaint is Granted, the Bank's Claims Against Boonville Hospital are Disallowed Unless and Until the Bank Has Paid the Amount for Which It is Liable Under Section 550 of the Bankruptcy Code, (2) That, to the Extent the Relief Requested in Count IX of this Complaint is Granted, the Bank's Claims Against Joy's Majestic are Disallowed Unless and Until the Bank Has Turned Over the Property, if Any, for Which It is Liable Under Section 550 of the Bankruptcy Code, and (3) That, to the extent the Relief Requested in Count X of This Complaint is Granted, the Bank's Claims Against Rojana are Disallowed Unless and Until the Bank Has Turned Over the Property, if Any, for Which It is Liable Under Section 550 of the Bankruptcy Code**

134.    The averments in Counts IV, V, VI, IX and X of this Complaint are incorporated by reference in Count XI of this Complaint as fully and completely as if restated in Count XI in their entirety.

135.    Under section 502(d) of the Bankruptcy Code, the claims of an entity from which property is recoverable under, among other sections, section 550 of the Bankruptcy Code or that is the transferee of a transfer avoidable under, among other sections, section 548 or 544 of the Bankruptcy Code must be disallowed unless such entity or transferee has paid the amount, or turned over the property, for which it is liable under, among other sections, section 550 of the Bankruptcy Code.

136.    Accordingly, to the extent the avoidance claims asserted against the Bank in this Complaint are sustained, the Bank's claims against the implicated Debtor must be disallowed

37

unless the Bank pays the amount or turns over the property, if any, for which it is liable to the Estate under section 550 of the Bankruptcy Code.

137.    WHEREFORE, Plaintiff respectfully requests that (1) judgment be entered in favor of the Estate against the Bank, under section 502(d) of the Bankruptcy Code, on Count XI of this Complaint declaring (i) that, to the extent the relief requested in Counts IV, V or VI of this Complaint is granted, the Bank's claims against Boonville Hospital are disallowed unless and until the Bank has paid the amount for which it is liable under section 550 of the Bankruptcy Code, (ii) that, to the extent the relief requested in Count IX of this Complaint is granted, the Bank's claims against Joy's Majestic are disallowed unless and until the Bank has turned over the property, if any, for which it is liable under section 550 of the Bankruptcy Code, and (iii) that, to the extent the relief requested in Count X of this Complaint is granted, the Bank's claims against Rojana are disallowed unless and until the Bank has turned over the property, if any, for which it is liable under section 550 of the Bankruptcy Code; and (2) the Court grant Plaintiff such other and further relief as is proper.

138.    With respect to each count of this Complaint, any averment in this Complaint not expressly incorporated into such count by reference which is necessary to support the claims asserted in such count shall be deemed incorporated into such count by reference.

[*Remainder of Page Intentionally Left Blank*]

US2008 17061808 11

Dated:  July 8, 2020
    Kansas City, Missouri

Respectfully submitted,

/s/ Larry A. Pittman, II
**CONROY BARAN**
Robert Baran, Esq. (KS#19681)
Larry A. Pittman, II, Esq. (D. Kan. 78034)
1316 Saint Louis Avenue, 2nd Floor
Kansas City, MO  64101
Telephone:  (816) 210-9680 / (816) 616-5009
Email:  rbaran@conroybaran.com
        lpittman@conroybaran.com

-AND-

**KILPATRICK TOWNSEND & STOCKTON LLP**
Todd C. Meyers (admitted *pro hac vice*)
Colin M. Bernardino (admitted *pro hac vice*)
1100 Peachtree Street, NE, Suite 2800
Atlanta, GA  30309-4530
Telephone:  (404) 815-6500
Facsimile:  (404) 815-6555
Email:  tmeyers@kilpatricktownsend.com
        cbernardino@kilpatricktownsend.com

*Counsel for the Official Committee of Unsecured Creditors*

39